# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHICAGO DISTRICT COUNCIL OF ) <br> CARPENTERS PENSION FUND, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SIMPSON CONSTRUCTION CO. ) <br> ) <br> Defendant. ) | Case No. 03 C 6902 <br><br> Magistrate Judge <br> Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chicago District Council of Carpenters Pension Fund, Chicago District Council of Carpenters Welfare Fund, and Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program ("the Funds") brought this action against defendant Simpson Construction Company ("Simpson") under Section 502 of the Employment Retirement Income Security Act, 29 U.S.C. § 1132 *et seq.* ("ERISA"), and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 *et seq.* ("LMRA"). The Funds seek to collect delinquent employee benefits contributions that they allege Simpson owes under a collective bargaining agreement for carpenters' work performed on a construction project for the City of Chicago. (SF ¶ 1.) Before the court are the Funds' Motion for Summary Judgment as to Liability [dkt 57] and Simpson's Motion for Summary Judgment as to Liability [dkt 52]. For the reasons stated below, the Funds' motion is granted and Simpson's motion is denied.

## JURISDICTION

Federal jurisdiction exists in this case under 29 U.S.C. §§ 1132 and 185. (SF ¶ 1.) The parties consented to the jurisdiction of a magistrate judge [dkt 5, 6], and this case was assigned to this court [dkt 7] pursuant to 28 U.S.C. § 636©).

## BACKGROUND[1]

### I. The Parties

The Funds are multi-employer trust funds that provide fringe benefits to participant employees. (*See* SF ¶¶ 2, 6; *see also* 29 U.S.C. § 1002(7).) The Funds receive contributions from employers pursuant to the terms of collective bargaining agreements negotiated between the employers and the Chicago and Northeast Illinois District Council of Carpenters (the "Union"). (SF ¶ 2.) Simpson is an employer that is obligated by various collective bargaining agreements to pay monthly fringe benefits contributions to the Funds for each hour of carpenters' work performed by Simpson's employees. (SF ¶¶ 3-6.)

### II. The Collective Bargaining Agreement

The collective bargaining agreement relevant to this action (the "CBA") was in effect from 2001 through 2005. [Dkt 87.] Simpson does not dispute that it was signatory to and bound by that CBA, and Simpson admits that, under the CBA, it must pay contributions for jurisdictional work performed by its own employees. (SF ¶¶ 3-6.) The issue is whether Simpson is liable for

---

[1] These facts are taken from the parties' stipulated statement of facts and from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "SF ¶ __" [dkt 63] and "Pl.'s LR Resp. ¶ __" [dkt 70], "Defs.' LR Resp. ¶ __" [dkt 68]. Statements not responded to or not controverted by specific references to the record are deemed admitted. L.R. 56.1(b)(3).

contributions for jurisdictional work that was not performed by Simpson's employees, but was instead subcontracted to another company that was not signatory to the CBA.

Certain terms of the CBA are relevant to this dispute. Those terms provide, in relevant part:

> 3.2    EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work.
>
> 3.3    EMPLOYER, in recognition of the territorial and occupational jurisdiction of the UNION, shall not subcontract or contract out jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite the services of any other person, company or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the Employees covered by this Agreement.
>
> 3.4    Any EMPLOYER who sublets any of the work coming within the jurisdiction of Carpenters shall assume the obligations of any subcontractor to the extent of Carpenter labor employed on work under contract with the EMPLOYER for prompt payment of [contributions to the Funds] . . . , provided the subcontractor is not bonded as provided for in Article XV hereof. . . .
>
> 3.5    If an EMPLOYER, bound by this Agreement, contracts or sub-contracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the EMPLOYER shall require such sub-contractor to be bound by all the provisions of this Agreement, or the EMPLOYER shall maintain daily records of the sub-contractor or the sub-contractor's Employees' jobsite hours and be liable for payments to [the Funds], as provided in Articles XII, XIII, and XIV of this Agreement.

(SF ¶ 7; CBA at 3-4.)[2]

---

[2] Article XII of the CBA is titled "Health and Welfare Fund"; Article XIII is titled "Pension Fund"; and Article XIV is titled "Training Fund." (CBA at 8, 9.) These sections set forth the conditions for making contributions to the Funds. (*See id.*)

## III. The Natatorium Project

On June 12, 2001, Simpson entered into a contract with the Public Building Commission of Chicago (the "City") to build an addition to an existing Chicago Park District fieldhouse. (SF ¶ 8.) The "Natatorium Project" included construction of an indoor swimming pool, offices, an exercise room, locker rooms, and shower rooms. (SF ¶ 8.)

Simpson hired a subcontractor, Gem Construction, Inc. ("Gem"), to perform certain work on the Natatorium Project.[3] (SF ¶ 12.) Gem was not signatory to the CBA during the relevant time period. (SF ¶ 16.) The subcontract between Simpson and Gem ("Gem subcontract") stated that Gem was to provide labor, material, equipment and supervision for the "building concrete and site concrete work" for the Natatorium Project. (SF ¶ 15; Pls.' LR Resp. ¶ 3; Pls.' LR Resp. Ex. D, Gem Subcontract.)[4] It is undisputed that "building concrete and site concrete work" includes carpenters' jurisdictional work (Def.'s LR Resp. ¶ 3), although the record does not reveal how much of the building concrete and site concrete work was jurisdictional work and how much was not.[5]

Simpson asserts that, as a condition of awarding the subcontract to Gem, Simpson's president

---

[3] Simpson's contract with the City required that Simpson award 5% of the base contract price to a woman-owned business enterprise. (SF ¶ 11.) Simpson hired Gem to fulfill that requirement. (SF ¶ 12.)

[4] The work to be performed is described in the stipulated statement of facts and on the Gem subcontract as "building concrete and *site work* concrete." (SF ¶ 15; Gem Subcontract at 1 (emphasis added).) The parties sometimes describe the work as "building concrete and *site concrete* work." (Def.'s LR Stmt. ¶ 4 [dkt 55]; Pls.' LR Stmt. ¶ 3 [dkt 62] (emphasis added).) However, it appears that the parties are referring to the same work.

[5] Simpson's LR 56.1 statement includes assertions distinguishing "site concrete work" from "building concrete work." (Def.'s LR Stmt. ¶¶ 4, 6.) The Funds dispute Simpson's characterizations of those distinctions. (Pl.'s LR Resp. ¶¶ 4, 6.) That dispute is not material to the present motions and need not be resolved here. The material fact, which is undisputed, is that the work subcontracted to Gem included at least some carpenters' work.

Robert Hansen required Gem to use the carpenters of a third company, CRC International ("CRC") to perform any carpenters' work required for the Natatorium Project. (Def.'s LR Stmt. ¶ 15.) CRC was signatory to the CBA during the relevant time period. (SF ¶ 17.) Although Simpson and Gem had a written subcontract relating to the Natatorium Project, the condition to use CRC's carpenters was not included in that document. According to Simpson, it was an oral condition.[6] However, Simpson does not state when or where that alleged oral condition was agreed to, nor does Simpson identify the individuals who allegedly agreed to it. The only evidence in the record about the alleged condition to use CRC's union carpenters is the declaration of Mr. Hansen, which states, in relevant part, that "[a]s a condition of awarding the subcontract to Gem, I required Gem to use CRC's union carpenters to perform any carpenters work associated with that part of the job," and that "Gem and CRC agreed to this arrangement . . . ." (Def.'s LR Ex. 1, Robert E. Hansen Declaration ("Hansen Decl.") ¶¶ 20, 21 [dkt 54].)

CRC does appear to have had some involvement in the Natatorium Project. The record contains a work proposal from Gem to CRC that references the "Hayes Park [illegible] Natatorium" and states that Gem was to "[i]nstall: Footing, foundation, piers, floor, saw cut floor, one coat of cure & seal, perimeter insulation, grade beams and rebar to complete building concrete work." (SF ¶ 13; SF Ex. C, "CRC-Gem Proposal".)[7] The Funds admit that the work description of the CRC-Gem Proposal includes carpenters' jurisdictional work. (Pls.' LR Resp. ¶ 20.) Neither party, however, asserts that the Gem-CRC Proposal is a subcontract, nor does either party assert that CRC

---

[6] Although Simpson's LR 56.1 statements do not explicitly state that the alleged condition was an oral one, Simpson's argument states that it was. (*See* Def.'s Mem. at 4.)

[7] Much of the copy of the CRC-Gem Proposal submitted to the court is illegible.

entered into a formal subcontract with either Gem or Simpson. Mr. Hansen refers to the relationship between Gem and CRC as "'an informal joint venture' – meaning that they worked together on the job." (Pls.' LR Resp. ¶ 21; Hansen Decl. ¶ 25.)

The parties stipulate that CRC made at least some contributions to the Funds for carpenters' work performed on the Natatorium Project during the relevant period, *i.e.*, October 2001 through December 2002. (SF ¶ 25.) Specifically, CRC paid contributions for work performed by at least two carpenters whose names appeared on Gem's certified payroll. (Pls.' LR Resp. ¶¶ 27, 28, 37.) The Funds are seeking additional contributions allegedly owed for carpenters' work performed during the relevant period. (*See* Pls.' LR Resp. ¶ 37; Pls.' Mem. at 14; *see also* Compl. at 4 [dkt 1].) The precise amount of the alleged deficiency is not at issue because the parties have moved for summary judgment on the issue of liability alone, and the amount of damages is therefore not before the court. However, the parties' arguments are premised on a shared assumption that a deficiency does exist. (*See* Def.'s Mem. at 8; Pls.' Mem. at 1-2.).[8]

## LEGAL STANDARDS

**I.      Summary Judgment**

Summary judgment is warranted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©). In determining whether a genuine issue of material fact exists, the evidence is viewed and all inferences are drawn

---

[8]According to Simpson, CRC filed for bankruptcy protection, and the Funds were listed as a creditor. (Def's Amended Mem. at 12.)

in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Smith v. Ball State Univ.*, 295 F.3d 763, 767 (7th Cir. 2002). The mere existence of some factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for a motion to be denied. *Anderson*, 477 U.S. at 247-48. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992) (citing *Anderson*). An issue is "genuine" when a trier of fact, viewing the evidence in a light most favorable to the nonmoving party, could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248; *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998) (citation omitted).

On cross-motions for summary judgment, each party's motion is considered separately and all factual uncertainties are resolved and all reasonable inferences are drawn against the party whose motion is under consideration. *Benion v. Bank One, Dayton, N.A.*, 967 F. Supp. 1031, 1035 (N.D. Ill. 1997); *see also Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003).

**II.     Summary Judgment on Liability**

The present summary judgment motions are directed only to the issue of Simpson's liability. A court may enter judgment in favor of one party on the question of liability alone "although there is a genuine issue as to the amount of damages." Fed. R. Civ. P. 56©); *see e.g., Capitol Records, Inc. v. Progress Record Distribg., Inc.*, 106 F.R.D. 25, 30 (N.D. Ill. 1985) (granting summary judgment on the issue of liability where the only remaining issue was calculation of damages); *see generally* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* vol. 10B, § 2737 (3d. ed., West 2006). Summary judgment on liability alone may be

granted in ERISA cases such as this one, where employee benefits funds seek delinquent contributions from employers obligated under a collective bargaining agreement. *See Ill. Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1366, 1368 (7th Cir. 1995) (affirming district court's summary judgment as to employer's liability to employee benefits funds for contributions, but reversing summary judgment as to amount of damages); *Chicago Dist. Council of Carpenters Pen. Fund v. Faith Builders, Inc.*, No. 00 C 1036, 2001 WL 99839 at *2, *5 (N.D. Ill. Jan. 30, 2001) (Gettleman, J.) (granting summary judgment as to employer's liability for contributions under a collective bargaining agreement for work performed by employer's subcontractor).

### III. ERISA

Section 515 of ERISA provides the Funds the statutory right to collect contributions promised by employers under collective bargaining agreements that the employers enter into with labor unions:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 515 requires that an employer keep its promise to make contributions to employee benefits funds regardless of any side-understandings the employer may have with the union, *Central States, S.E. and S.W. Areas Pen. Fund v. McClelland, Inc.*, 23 F.3d 1256, 1257-58 (7th Cir. 1994), and regardless of any defenses applicable to the original parties to a collective bargaining agreement, *Central States, S.E. and S.W. Areas Pen. Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 (7th Cir. 1989). The policy behind § 515 is the protection of employee

benefits:

> Congress enacted section 515 because the failure of employers to make promised contributions imposes costs on plans that adversely affect beneficiaries. It determined that earlier law for collecting delinquent contributions had been insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. Section 515 was intended to permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law . . . .

*Laborers' Pen. Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 778 (7th Cir. 2002) (internal quotations and citations omitted).

### IV.     Contract Interpretation

When a contract is considered in the context of an ERISA claim, federal common law rules of contract interpretation apply.[9] *Central States, S.E. and S.W. Areas Pen. Fund v. Kroger Co.* ("*Kroger I*"), 73 F.3d 727, 731 (7th Cir. 1996). Under those rules, a contract should be "read as a whole with all its parts given effect . . . ." *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (citation omitted). In addition, contract terms are given their "ordinary and popular sense." *Id.* at 784.

The court must also consider whether the contract term or terms at issue are ambiguous. *Kroger I*, 73 F.3d at 732. Whether a term is ambiguous is a question of law. *Id.* A contract term is ambiguous if it is reasonably susceptible to more than one meaning. *Id.* When parties suggest

---

[9] While "collective bargaining agreements are interpreted under federal law," courts may also "draw guidance from state law principles if they are compatible with federal labor law policies." *Intl. Brotherhood of Elec. Workers v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 405 (7th Cir. 2002) (citations omitted).

different, yet reasonable, interpretations of a contract term, the term is ambiguous. *Id*. An ambiguity is not created "because of parol evidence, such as the fact that an employer joined with its fingers crossed behind its back," nor is it created "because of statements people made to each other about the meaning of otherwise-clear documents." *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pen. Plan*, 3 F.3d 994, 999 (7th Cir. 1993) (citations omitted). If a contract is found to be ambiguous, questions of interpretation must be resolved by the trier of fact. *Kroger I*, 73 F.3d at 732.

On the other hand, a contract term is unambiguous "if it is susceptible to only one reasonable interpretation." *Indep. Const. Equip. Builders Union (ICEBU) v. Hyster-Yale Materials Handling, Inc.*, 83 F.3d 930, 933 (7th Cir. 1996). The court may declare the meaning of an unambiguous term as a matter of law. *Kroger I*, 73 F.3d at 732.

## ANALYSIS

The issue is whether Simpson is liable for unpaid contributions owed to the Funds for carpenters' work performed on the Natatorium Project. The court must first interpret the relevant terms of the CBA and then determine whether there is there is a genuine issue of material fact about whether Simpson is liable for the unpaid contributions.

### I.   Interpretation of the CBA

Although neither party argues that the relevant terms are ambiguous, each party offers a somewhat different interpretation of two terms and argues that the terms unambiguously favor its respective position. (*See* Pls.' Mem. at 3-5; Def.'s Mem. at 3, 7; Def.'s Resp. at 4, 13.) Although

the differences may seem subtle, Simpson argues that under its interpretation, the CBA allows it to subcontract carpenters' work to a non-signatory as long as the carpenters who do the work are, in fact, employees of a signatory company. Further, Simpson argues, if the carpenters who do the work are employees of a signatory, it (Simpson) is not in breach of the CBA and, accordingly, cannot be liable for any deficiency. (Def.'s Mem. at 3-5.) The Funds argue that under their interpretation, Simpson is liable for contributions for carpenters' work performed under its subcontract with a non-signatory, whether that work was performed by the non-signatory's carpenters or not. As discussed below, the CBA terms are not ambiguous. The Funds' interpretation is correct and Simpson's is not correct.

A.     Article 3.2

The parties disagree about the meaning of Article 3.2, which provides, in relevant part, that the employer "shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION . . . ." The Funds argue that Article 3.2 forbids an employer from subcontracting jurisdictional work to companies who have not signed a collective bargaining agreement with the Union.[10] (Pls.' Mem. at 6.) Simpson argues that Article 3.2 "requir[es] . . . that jobsite carpenters

---

[10] There is some confusion in the Funds' brief about their interpretation of Article 3.2. On one page, the Funds state that Article 3.2 forbids the employer from subcontracting to companies "who are not required to pay the same wages and benefits" as the employer is required to pay under the CBA. (Pls.' Mem. at 4.) On another page, however, the Funds state that Article 3.2 "forbid[s] subcontracting work to non-signatories." (Pls.' Mem. at 6.) The "same wages and benefits" language corresponds to Article 3.3, whereas the "forbids subcontracting work to non-signatories" language corresponds to Article 3.2. It is therefore fair to infer that the Funds intended to argue for the interpretation that corresponds to the language of Article 3.2.

-11-

work be subcontracted to a signatory company." (Def.'s Mem. at 3.) Simpson's interpretation is not correct because Article 3.2 is not phrased in terms of *requiring* the employer to subcontract carpentry work. Instead, it states that the employer "shall not" subcontract jurisdictional work to nonsignatories, which, by its plain terms, is a prohibition. Accordingly, the Funds' interpretation is correct.

### B. Article 3.3

Article 3.3 provides, in relevant part, that the employer "shall not subcontract . . . jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite services of any other person, company or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the Employees covered by this Agreement." The Funds argue that Article 3.3 "forbids the signatory from subcontracting to any company who does not maintain the same terms and conditions of employment as signatory companies." (Pls.' Mem. at 4.) Simpson argues that Article 3.3 "*permits* subcontracting to or the utilization of companies or persons that 'observe the same wages, fringe benefits', etc., as contained in the carpenter's CBA . . . ." (Def.'s Mem. at 3 (emphasis added).) Simpson's interpretation is not correct because Article 3.3 is not phrased in terms of permitting anything. Instead, it explicitly states that the employer "shall not" subcontract jurisdictional work, or use the jobsite services of, a company that does not provide its employees with the same wages, fringe benefits, hours, and other conditions of employment as required by the CBA.

### C. Article 3.4

The parties agree about the meaning of Article 3.4. Article 3.4 provides, in relevant part:

> Any EMPLOYER who sublets [jurisdictional work] shall assume the obligations of any subcontractor to the extent of Carpenter labor employed on work under contract with the EMPLOYER for prompt payment of Employees' Wages, Health and Welfare, Pension and Apprentice Training Contributions . . . *provided the subcontractor is not bonded* as provided for in Article XV hereof.

(CBA at Article 3.4 (emphasis added).) The parties agree that Article 3.4 means that the employer assumes the obligation of its subcontractor to make contributions to the Funds for carpenters' work if the subcontractor is not bonded as required by the CBA. (Def.'s Mem. at 3; Pls.' Mem. at 4.) To be "bonded" means that the employer obtain a cash or surety bond payable to the Union the purpose of which, in part, is to "insure prompt payment of . . . contributions to the [Funds]." (CBA at Article XV.) Article 3.4, in short, provides that the employer is liable for contributions owed to the Funds if no bond was obtained by the subcontractor in the amount required by the CBA.

### D. Article 3.5

The parties apparently also agree about the meaning of Article 3.5. The parties agree that, by its plain terms, Article 3.5 provides that, if an employer subcontracts work to a subcontractor that is not party to the CBA, the employer must either: (1) require the subcontractor to be bound by the terms of the CBA, or (2) maintain records of the hours of carpenters' labor worked by the subcontractor's employees and be liable for contributions required for those hours. (*See* Pls.' Mem. at 9; Def.'s Mem. at 7-8.)

## II. Application of Facts to Unambiguous Terms of the CBA

The undisputed facts show that Simpson subcontracted carpenters' jurisdiction to another

-13-

company (Gem) that was not signatory to the CBA. There is no evidence that Simpson required Gem to be bound by the CBA. Therefore, under the express terms of Article 3.5, Simpson is liable for contributions owed to the Funds for jurisdictional work performed under Simpson's subcontract with Gem. *See Faith Builders*, 2001 WL 99839 at *2, *3 (holding that employer was liable for contributions where it was undisputed that employer was bound by a collective bargaining agreement, that agreement required contributions for covered work performed by the employer's subcontractor, and work performed by subcontractor included covered work).

Simpson attempts to avoid liability by arguing that its arrangement with Gem and CRC complied with the terms of the CBA. Simpson argues that it complied with Articles 3.2 and 3.3 of the CBA by including an oral condition to its subcontract with Gem that required CRC to perform the carpenters' work because CRC was signatory to the CBA. (*See* Def.'s Mem. at 4-5.) Simpson observes that there is no evidence that any carpentry work was done by any workers other than CRC carpenters. Accordingly, Simpson argues, CRC is liable for contributions on behalf of its employees, not Simpson.

To start, Simpson has failed to demonstrate that there is admissible evidence of the alleged oral condition. The statements in Mr. Hansen's affidavit are conclusory and fail to provide any factual foundation for the claimed oral condition. There is no information about when, where or with whom the communications giving rise to the alleged condition took place. An affidavit submitted in support of summary judgment must demonstrate that there is admissible evidence to support the asserted fact. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Affidavits lacking in foundation are not sufficient. *Joseph P. Caulfield & Assocs., Inc. v. Litho Products, Inc.*, 155 F.3d 883, 888 (7th Cir. 1998). While Simpson is correct that affidavits submitted in connection

with summary judgment motions are usually "self-serving" (Def.'s Am. Mem. at 3 n. 2), it is not the self-serving nature of Mr. Hansen's affidavit that precludes the court from considering it, but his failure to provide an evidentiary foundation for the claimed oral condition. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (stating that testimony opposing summary judgment motion was properly rejected not because it was self-serving, but because it lacked evidentiary foundation in personal knowledge). Simpson has not met the threshold for consideration of such an alleged oral condition.

Furthermore, even assuming, *arguendo*, that Simpson could present evidence demonstrating that Simpson and Gem agreed to the claimed oral condition to use CRC carpenters, and further assuming, again *arguendo*, that such a condition was valid and enforceable, that condition would not relieve Simpson of ultimate liability for deficiencies in contributions. Under the express terms of the CBA, Simpson remains responsible for the contributions for carpenters' work unless Simpson's subcontractor is itself a signatory or bonded. Simpson does not dispute that Gem was its subcontractor and that it did not require Gem to be bound by the CBA. Simpson also does not dispute that CRC was *not* its subcontractor. Simpson is liable for contributions for jurisdictional work performed under the Gem subcontract, regardless of whether that work was performed by CRC carpenters.

This interpretation is consistent with the purpose and policy of § 515 of ERISA. Section 515 provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms . . . of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions . . . ." As discussed above, § 515 has been interpreted as requiring an employer to pay contributions regardless of any oral understandings or side agreements between

the employer and the union and regardless of any defenses applicable to the original contracting parties that may make the CBA unenforceable. *McClelland*, 23 F.3d at 1257-58; *Gerber Truck*, 870 F.2d at 1149. Under the CBA, Simpson promised to be liable for contributions for its subcontractor's work if the subcontractor was not itself liable for such contributions. It would be contrary to the policies behind ERISA to allow Simpson to avoid its obligation based on a claimed oral side agreement with a non-signatory subcontractor.[11]

The Funds make several additional arguments. For instance, the Funds argue that Simpson is liable for contributions under Article 3.4 because Gem was not properly bonded as the CBA required. (Pl.'s Mem. at 6-7.) The Funds, however, provide no evidence supporting that assertion, nor do they make such an allegation in their complaint. It is not necessary to reach the other arguments made by the Funds, for example, that Simpson cannot use an arrangement with CRC to it prevent its liability here because such an arrangement was a breach of Simpson's contract with the City (Pl.'s Mem. at 14-15), and that Simpson breached Article 3.5 by failing to maintain accurate records of jurisdictional work performed by Gem's (or CRC's) carpenters. (*Id.* at 9-14.)[12]

---

[11] Simpson points to the decision in *Sullivan v. William A. Randolph, Inc.*, No. 04 C 2736, 2005 WL 2483374 (N.D. Ill. Oct. 5, 2005) (Der-Yeghiayan, J.), *appeal filed*, 7th Cir. July 19, 2006. In that case, however, the court determined that nothing in the CBAs at issue there required contributions for work performed by subcontractors. 2005 WL 2483374 at * 5. That is not the case here.

[12] The Funds discuss at length both Simpson's alleged failure to maintain accurate records or produce a complete set of records of the number of hours worked (both jurisdictional and non-jurisdictional) on the Natatorium Project and Simpson's alleged failure to produce a complete set of records. (*See* Pl.'s Mem. at 9-14.) The accuracy of an employer's record-keeping methods may be material to the issue of the amount of contributions owed, which can be established by producing an audit report estimating the amount owed. *See Chicago Dist. Council of Carpenters Pen. Fund v. Reinke*, 347 F.3d 262, 265 (7th Cir. 2003). If the employer does not offer a sufficient explanation as to why the audit report's estimate is not accurate, then judgment in that amount may be granted in favor of the fund. *See id*. Here, the Funds have

Finally, the Funds submitted a supplemental LR 56.1 statement titled "Plaintiffs' Additional Material Facts." None of those facts were necessary to deciding the issue of Simpson's liability under the CBA and therefore have not been considered.

## CONCLUSION

For the reasons stated above, the Funds' motion is granted and Simpson's motion is denied. A status hearing is set for January 8, 2007 at 9:45 a.m.

**IT IS SO ORDERED.**

_____
**Geraldine Soat Brown
United States Magistrate Judge**

**Dated: December 18, 2006**

---

presented an audit report suggesting contributions are owed. (SF Ex. E.) However, the Funds have moved for summary judgment as to liability only. The issue of the amount owed is left for further proceedings.